3399 USA v. Douglas. Mr. Patton. Good morning, your honors. May it please the court. I'm Tom Patton and I represent the appellant Ryan Douglas. The two warrants at issue in this case, the house warrant and the cell phone warrant, are examples of how not to write warrant applications. Neither warrant establishes probable cause. This court needs to say as much so this practice can stop. Probable cause isn't a particularly high standard. I understand that. But it is a meaningful standard. It is the standard that separates our citizens' privacy to their home, to their person, to their cell phones, from government intrusion. And neither warrant in this case established probable cause. And the district court went wrong in allowing speculation to take the place of inferring reasonable inferences drawn from facts. The only thing that linked the house to any drug activity was that Mr. Douglas briefly went there after the controlled buy was set up. Now clearly there's probable cause to believe he was selling drugs. They'd done buys from him. Didn't he also stop by the house before he went? He did. When they set up this... So he gets a call. He goes, be right there. I'm at the store. He goes to the house, comes out, goes to the controlled buy, then goes back to the house. That's right. That's the only connection to the house. They don't say he lives there. They don't say he's been there before. They don't say the black BMW has been seen parked there before. Nothing. As in like in Yarbor where they said, hey, after two controlled buys, he goes back to this place. We know it's his girlfriend's place. We know his car is registered to his girlfriend. The facts of Yarbor, there are more facts in Yarbor than we have here. I take your point on that. You suggest that an affirm would mean that the officers can search any place a defendant goes after a drug deal. And you do have this point in Yarbor that says it wouldn't be quite right to just search any place a defendant goes after a drug deal. Is that formulation too broad based on what we have here? Because the officers didn't search just any place he went to after a drug deal. They searched the place he went to after a drug deal, which also was the place he went to right before the drug deal. Should that make a difference? I don't think that's a material difference. Because the idea is, look, people that engage in crime sometimes will stop by other people's houses or other places, right? And it's not like they had him under surveillance from the store and they say, oh, he went straight from the store to this location, to the buy, and then back to this location. I mean, for all they know, he stopped somewhere else in between leaving the store. Or that he had the drugs while he was at the store, right? Because the only constant through all of these was the black BMW, right? And so it is that because the probable cause standard is there's got to be probable cause to believe that evidence of the drug dealing is going to be at the house. That there would be probable cause to believe that he would store stuff at the house, he would keep stuff at the house. So would their argument be stronger if they actually surveilled him on the path from the store to the house and saw that he only went from the store to the house as opposed to potentially, as you mentioned, stopping somewhere else? I think it would be stronger. I would submit it wouldn't be enough. Because unless they had a longer term surveillance on him, because again, we know he's dealing drugs out of the black BMW, right? That's the consistent through the two prior ones and then the ones, then what they observed on the day in question. And so there's just not enough of facts. There are not enough facts to draw a reasonable inference that he has any more connection to this house than he just stopped by there one day. That he knows some people that lived there. He stopped by there. But hey, in the process of going out there for the day, he gets a text from somebody saying, hey, can you get me a couple ounces? And he's like, yeah, all right. Well, I can do that because I got the stuff in the car. So I'll stop by, drop my stuff off, go do it. And that's the problem with the warrant. There's not enough connection to the house to draw the reasonable inference that there is probable cause to believe evidence of drug dealing is going to be at the house. Because they never say it's his house. They never say whose house it is. That he has any other connection to this house than he happened to go there on the day where he does this controlled buy. And yeah, he goes there before and after. But again, that doesn't distinguish anything or raise any reasonable inference that he stores stuff at the house. Or that's where he's doing his business out of it. That it's nothing that, hey, we think it's a stash house for him. Or we've seen, at least in Yarborough, they said, look, we've seen this car that he does all the deals with at the place on other occasions. We've staked the place out and seen it on three different occasions not linked to controlled buys where the car's at the house. So you then have the reasonable inference, oh, it's his girlfriend's house. The car's parked there a lot. He goes there after multiple controlled buys. Here there's just nothing like that. Let's turn to the phone. Sure. The phone is even worse. Because if this affidavit is good enough, then Riley means nothing. Right? Because Riley says we are not going to let you search a cell phone simply because a person who gets arrested for an offense has a cell phone on them. That's the whole point of Riley v. California. The only thing this affidavit said was we did a controlled buy off of him and we arrested him and he had a phone. Now, look, yeah, the controlled buy was set up using a cell phone, either through a call or text message. I don't deny that. He says I'm at the store. But as we point out in the brief, the government goes in front of juries and judges and courts all the time and says, hey, drug dealers use multiple phones. They use burner phones. It's a tool of the trade. Right? And when he gets arrested in the car, they search the car because they tow it. There's no drugs in it. There's no drugs on him. So there's no evidence that at the time he gets stopped, he's engaged in drug dealing. So there's no reasonable inference that the phone he has, which according to the affidavit, it could have been because they used it within the 72-hour language. You know, as far as the judge issuing the warrant knows, it's been up to three days since the controlled buy happened. Hey, three days later, he gets caught driving the car with no drugs, no evidence that he's actively at that time engaging in drug dealings. But hey, he's got a cell phone on him, so let us search the phone. The cell phone was contacted on two occasions, two controlled buys, right? So it wasn't just the time that he was in the store and they stopped by the house. There was another instance in February of 2018 where the CI contacted that phone as part of… They didn't know he contacted that phone. They didn't do any investigation to link the phone they asked to be searched to the phone that was contacted. We make the point in the brief. All they got to do is call the number, right? Because the reason we know it's the same phone is the search warrant affidavit literally puts the phone number from the earlier controlled buy that you're referencing in the controlled buy here. So they've got the phone seized, right? It's not a search to call the phone, to dial those numbers, see if the phone rings. Oh, so you're saying that they had no idea that the phone that they confiscated and searched was the phone that's affiliated or associated with that number? Exactly, Your Honor. And they took no steps to try and determine it, right? And it just… Look, drug dealers use cell phones to sell drugs. I mean, it's just… Yeah, that's a gift. Why wouldn't the good faith exception apply to both warrants? No, I would say not, Your Honor. And this is… Another sip of Weinheim. Well, number one, Riley v. California, I think, for the cell phone doesn't… The Lindsay case out of the First Circuit that the government cites, I think, admits that, hey, we can't have a rule that just automatically says you get arrested for drug dealing, you get to search a phone. But I think Riley v. California, period, establishes that. With the house, I think it is Yarber that does it. And this court's opinions in Korth, I'm going to butcher this name, I'm sorry, Mike Kydock and Bell, they make the point that especially for federal task force officers, they have a duty to know the relevant federal law because they work with federal prosecutors regularly. And look, there's a reason this 14-gram case ended up in federal court. It's because they knew, because these agents and the prosecutors talked, he was going to be a career offender. And they filed an 851 notice based on his prior Illinois cocaines to jack up the statutory maximum. You know, his career offender guideline was going to be 262 to 327. Now, Ruth knocked out the Illinois cocaine. So these local cops that are on the task forces, they talk with the agents. They know and need to know federal law. And I would say Yarber puts any agent on notice, hey, just going to a house on the day of one controlled by isn't enough. So we'd submit that there's not good faith for either warrant. I see my time's up. Thank you, Mr. Patton. And Mr. Simpson. Good morning, Your Honors. May it please the court. I'm Scott Simpson on behalf of the United States. As defense counsel has said, there's no dispute here that Mr. Douglas was involved in dealing drugs from his black BMW. So the only question here is connecting that activity to the house, to the 16th Street house, and to the cell phone found on Mr. Douglas's possession upon his arrest. First, in relation to the house, as some members of the panel have already mentioned, Mr. Douglas arranged a drug sale over the phone while he was at a store. Then he immediately drove from that store to the house. True, there was no surveillance during that drive, but it took him 10 minutes to arrive back at the house. He carried the results of his shopping trip into the house. Then he left right away and drove directly to the location of the drug sale from that house. And then after the sale, he drove directly back to that 16th Street house. The question here is whether there was a fair probability that evidence of Mr. Douglas's drug dealing would be found at the house. But in other cases where we found a fair probability, there was more. Your Honor, obviously there can be more. In fact, defense counsel says that the police should have called the phone that was found on Mr. Douglas's possession at the time. That certainly would have given more. But here we submit, Your Honor, fair probability. We're not talking about establishing beyond a reasonable doubt that the house is used for drug dealing. We're talking about just a fair probability that evidence of drug trafficking would be found at the house. And we submit that these facts strongly suggested that Douglas was using the house as a base of operations for his drug trafficking. Imagine you're away from home, say you're at a store, and your friend calls you on the phone and asks you to bring him such and such. And you say, I'm going to quote the sentence from the affidavit that summarizes or paraphrases what Mr. Douglas said. It says, Douglas advised he was leaving the store and would be at the predetermined location shortly. And as I said, he arrived at the store after that call in 10 minutes. So imagine you tell your friend that, okay? I'll bring you this stuff, and you imply at least that you're going to do it right now. So where do you go after that call? You go to where you have the thing that your friend asked you to bring to him. So you go to that. You go to your home, which is what Mr. Douglas did here. You go to where you have that thing that you're going to take to your friend. So Douglas clearly went where he was keeping his drugs. That's at least a reasonable, at least a fair probability here. And that's what we're talking about, only a fair probability. Could he have gone home or to the house just to drop off the shopping stuff that you mentioned? It's possible, Your Honor, but that itself would suggest that he had a connection to the house. And as this court has said, if we show that someone is living, residing at a house, that is also part of probable cause to suggest that the person has. But then if it's his mother's house and he's going to drop off her frozen items that he bought at the store for her. Maybe a turkey? And then he's returning there to finish checking on her after he finishes his drug deal. That's possible, Your Honor. However, all the sequence here, the speed with which all this happened. And again, we're not talking about reasonable suspicion. We are talking beyond a reasonable doubt. I'm sorry, we are talking about reasonable suspicion. The question is because there are so many possibilities. I mean, we could sit here all day and think of all the different iterations of what happened, what was at house perhaps. Should there be a floor of what we're asking of officers before they get a warrant? And do the rest of the cases, Yarbrough, et cetera, et cetera, establish a higher floor than we see here? No, Your Honor. Even sticking with the fair probability language. And I wanted to address Yarbrough. Yarbrough, the defense's reliance on Yarbrough here puts us in kind of an odd situation. Normally, when we are responding to a decision that the defense is trying to rely on, when we are distinguishing a decision that they're trying to rely on, it's a decision that was decided against the government. But in this case, Yarbrough was decided in the government's favor. So, and as I think some members of the panel have already mentioned, there are some differences between this case and Yarbrough. And we would suggest that in some respects, this case presents facts that are even more strongly in favor of reasonable suspicion than Yarbrough. In Yarbrough, the defendant only drove to the apartment after his two drug sales. Whereas here, Mr. Douglas drove to the house immediately before drug sale and immediately again immediately after the drug sale. So, in Yarbrough, you're looking at, well, maybe he didn't get his drugs from the apartment. But here, because he went to the apartment after promising to bring drugs, that supports an inference that the drugs were at the house. And here, also, another difference between this case and Yarbrough. Whereas in Yarbrough, the affidavit expressly said that Mr. Yarbrough lived somewhere else. It identified another apartment as his residence. Here, there was no statement along those lines, leaving open again the inference that, well, maybe he did live there. You also have the fact, one more fact here. You also have the fact that the 16th Street house, the house involved here, was located only about two, two and a half blocks from the bar that was involved in the second controlled buy. Now, the state judge, this is a fairly small city. This is Quincy, a fairly small city. The state judge may well have realized that they were in the same general area, that bar and the house were in the same general area. Let's talk about the phone. Certainly. How did the judge know, the affidavit has the phone number in it, but how did the judge know that the number was linked to Douglas? The officer, I'm sorry. Well, certainly, Your Honor. Here, we certainly know that Mr. Douglas was using a phone to arrange his drug sales. And he was clearly driving around to do his drug sales. He was clearly selling from his black BMW. So, you have the same number, the same phone number used for two of his controlled buys. It was clearly a cell phone despite what the defense says in their brief. It was clearly a cell phone because Mr. Douglas took that call while he was in the store. He was obviously using a cell phone, not a landline. And then no more than three days after that last controlled buy, he was arrested carrying a cell phone with him in his car. Now, on this argument that the police could have called that phone, maybe they wish now that they had called that phone. I don't know why they didn't. But the fact that the police could have done more, could have gained additional facts to support reasonable suspicion, doesn't mean that we absolutely have to have that additional information. Officers could almost always get additional information to support reasonable suspicion. So, in light of these facts, again, the fair probability, that's all we're looking for. In light of these facts, there was at least a fair probability that evidence of drug trafficking would be found on that phone that Mr. Douglas had upon his arrest. The defense talks about the fact that, and it's true, we see it all the time, that drug dealers use multiple phones. Here, that wasn't happening. Here, the evidence shows that that was not happening. Here, the evidence shows that Mr. Douglas was only using one phone. We have one phone number connected to two of his calls, and he had only one phone upon his arrest. That, again, supports the inference that that was the phone he was using for his drug trafficking. Finally, Your Honors, sometimes when I get to the point of good faith, I'm not sure what to say. Based on all that we've said, based on all that we've already said about the existence of probable cause, obviously, this case, at least, if the court doesn't find probable cause, at least it is to be affirmed based on good faith. The opposite of good faith, of course, is bad faith, and this court has said that only on rare occasions, quote, unquote, has the court found that officers acted in bad faith in relying on a warrant issued by a judge. The mere fact, as the court has said, the mere fact that they got a warrant, that they went to the judge and got two warrants, provides a presumption that they were acting in good faith. Certainly, there's no basis for finding a bad faith. So, for all those reasons, Your Honors, we urge the court to affirm. Thank you. Mr. Patton, we'll give you two minutes. Your Honors, the critical thing that Yarber says is that, Your Honor, there is a floor, and the floor is you have to have enough facts connected to a house to allow for the search of that house, and Yarber had the defendant there multiple times over a period of time. Some of those times, not even linked to drug activity, just staking out the house, so you had a continuing connection between the defendant and that house. Here, they didn't do any of that. They just don't have any of it. If you affirm here, it's you go to a house the same day, somewhere in the middle of doing a controlled buy, that house gets to get searched. If you're dropping off groceries at your mom's house or you're just going to some friend's house, as I put in the brief, look, if it's Sunday afternoon and you run in and you drop off a case of beer and then run out, do the thing and come back, it's speculation that you have some further connection to that house, not drawing reasonable inferences. You mentioned Riley. Why isn't the best reading of Riley that phones are so important to our modern daily life now,  not that you can't just automatically get a warrant for everybody you want to search and you don't need to have a reason for a warrant? Can you point me to the language in Riley? Because I don't see it in your brief that is making the proposition that you want to make. The point I was trying to make in the brief is Riley clearly says you have to get a warrant to search this stuff because it has just an incredible amount of personal information. Which they did. But the warrant means you have to establish in the application that there's probable cause to believe that there is evidence of a crime on the phone. So if all you have to do to get the warrant is to say we arrested him for a crime, he has a cell phone with him, well, you know, people use cell phones. If he's getting arrested for a crime, they've got probable cause to believe that he committed some crime, right? That's what gives them the right to arrest him. If all they have to say is we arrested him, he had a cell phone, so there's probable cause to believe he used that phone to commit the crime we're arresting him for. The warrant requirement serves no purpose because in Riley they had the phone because they arrested the person, right? And the question was can you just search an incident to arrest? No, you've got to have some warrant to establish. When you have to get a warrant, the basic tenets of a warrant is you have to establish probable cause to believe there is evidence of a crime on the phone. So it doesn't accomplish anything to put a judge in between the police and a citizen's phone if all the judge is doing is checking to see, well, did you arrest him for something first? That's the point we're making. Thank you. Thank you. Okay, we'll take the case under advisement.